# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NATHAN SCHMIDT,                         )
                                        )
                        Plaintiff,      )        2:09-cv-707
        v.                              )
                                        )
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )
                        Defendant.      )
                                        )

**MEMORANDUM OPINION AND ORDER OF COURT**

## I.      Introduction

Pending before the court are cross-motions for summary judgment based on the administrative record: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 10) and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 8).  The motions have been fully briefed and are ripe for resolution.

Plaintiff, Nathan Schmidt, brought this action pursuant to 42 U.S.C. § 405(g) and §1383(c)(3) for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied his application for supplemental security income ("SSI") under title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f.

## II.      Background

### A.      Facts

Plaintiff was granted SSI benefits as a child. At the age of eighteen years old, the agency redetermined Plaintiff's eligibility for SSI.  R. 13. Plaintiff was born on January 9, 1988, and was 20 years old at the time of the hearing, and therefore was defined as a "younger

individual," age 18-44,  pursuant to 20 C.F.R. §416.963. R. 40. Plaintiff has at least a high

school education and is able to communicate in English. R. 23.  Plaintiff worked for very brief

periods of time as a food preparer in fast food restaurants, as a cashier at a gas station, and as a

laborer at an aluminum company. R. 366, 460-466.

In November 1994, at the age of six, Plaintiff was tested by his school psychologist

and was determined to have an IQ Performance Scale of 66, Verbal Scale of 61, and Full Scale

of 61 with a diagnosis of mild mental retardation.  R. 260. Plaintiff was placed in special

education classes. R. 471. On November 19, 2001, Plaintiff underwent a psychiatric evaluation

at Wesley Acute Partial Hospitalization Program for depression and increasingly oppositional

behavior. R. 186. The psychologist reported that plaintiff had periods when he was suicidal and

would run away from home and run out in front of cars and jump from windows impulsively.

R. 187. Plaintiff would also see ghosts and hear voices from the attic. *Id*. Plaintiff was

diagnosed with major depressive disorder, adjustment disorder with disturbance conduct, rule

out ADHD, and rule out oppositional defiant disorder. R. 188. He was placed on psychotropic

medications. R. 189.

From February 24, 2002 through March 9, 2002, Plaintiff was hospitalized at

Western Psychiatric Institute and Clinic (WPIC)for suicidal and aggressive ideation with

auditory hallucinations. R. 194-201. At discharge, it was noted that his mood was good and had

significantly improved since admission. R. 196.  Plaintiff was hospitalized again from March

15, 2002 through April 8, 2002 for suicidal ideations. R. 324. In late April 2002, he was

voluntarily committed for suicidal ideations and was discharged on May 6, 2002.  R. 205.

Plaintiff was placed in a partial outpatient hospitalization program at WPIC from May 10, 2002

through June 19, 2002. R. 213.  Ten hour a week wrap around services were also ordered

during this period. R. 213. Plaintiff was diagnosed with schizoaffective disorder, ADHD

combined, and ODD with his IQ noted as 59. R. 213. During this period, plaintiff ran away

from home and attempted to jump from a bridge on June 4, 2002. R. 232.


   Through July 2002, Plaintiff remained in the partial hospitalization program with a

reduced number of wrap around hours. R. 327. His standing diagnosis was major depressive

disorder, severe, without psychotic features. R. 334.  On October 16, 2002, Plaintiff was

involuntarily committed for his suicidal intention to jump from a bridge. R. 441. He was

subsequently discharged on October 29, 2002. R. 203. Plaintiff had several group and

individual therapy sessions from November through February 2003. R. 203, 210, 239, 437. On

February 11, 2003, Plaintiff reported suicidal ideations during a group session and was assessed

with a GAF of 25. R. 362. He was subsequently hospitalized from February 11, 2003 through

February 20, 2003. R. 432. His diagnosis was noted as mood disorder, NOS; rule out

schizoaffective disorder, ADHD combined type, ODD, and borderline intellectual functioning.

R. 432.

   Plaintiff was seen for individual therapy once a month from February 26, 2003

through April 2003 with reports of an okay mood throughout. R. 426, 427, 428. On May 7,

2003, Plaintiff was evaluated for admission to WPIC due to repeatedly running away from

home and refusing to take his medication for four months. R. 423-424. He was not hospitalized

at that time. *Id*.  He was seen again for individual therapy on May 12, 2003 and it was reported

that there was a continued failure to take his medications. R. 422. Plaintiff reported that his

mood was good or "fine" on both May 22 and June 17, 2003, but his mother reported that he had not been taking his medications, had trouble with the law, and possible dependency issues. R. 419, 421.

Plaintiff had individual therapy sessions on July 3, 2003 and July 9, 2003 wherein his mood was reported as "fine" or "bored." R. 417-418.  Plaintiff was evaluated for additional wrap around services on July 29, 2003. The psychologist reported that Plaintiff displayed extremely disruptive behavior in the school environment coupled with suicidal ideations and suicide attempts. He further reported that no treatment had been effective for his mood disorder, NOS; ODD, ADHD combined; and schizoaffective disorder. He recommended that Plaintiff be placed in a residential treatment facility. R. 416. By September 17, 2003, Plaintiff was doing better and consistently taking his medications. He was taking an emergency responder class because he wanted to become a fire fighter. His mood was good with neutral reactive affect. R. 412. At his October 7, 2003 individual therapy session, Plaintiff reported that he was doing well but was quiet and guarded during the interview. R. 407.

On January 18, 2004, Plaintiff reported that his mood was "fine" but had a dysphoric and restricted affect and was limitedly cooperative. It was noted that he did not appear to respond to anything. R. 406. On March 17, 2004, Plaintiff admitted that he was not longer taking his medications with no change or new symptoms. He reported feeling better without them and stated that he had found a job bussing tables at a local restaurant. His mood was noted as fine and his affect dysphoric and restricted. It was noted that he was guarded and vague with answers to questions and did not appear to respond to anything. R. 405.  On November 29,

2005, it was noted that Plaintiff worked at Steak N' Shake for a period of time but was subsequently released and was training to become a fireman. R. 242.

Plaintiff turned eighteen on January 9, 2006. R. 40. He did not receive further treatment until April 5, 2007 when he voluntarily admitted himself to UPMC McKeesport for depression. Plaintiff indicated at admission that it had been three years since he was involved in outpatient treatment or on psychotropic medications. The psychologist reported that Plaintiff was minimally cooperative during the meeting and possibly withheld information. Plaintiff's intelligence was noted as in the average range with no cognitive deficits present. Upon mental examination, the psychologist reported that Plaintiff's mood was moderately depressed with constricted affect. Plaintiff came across as moderately paranoid. The psychologist diagnosed Plaintiff with bipolar disorder rule out psychotic features and rule out personality disorder not otherwise specified with schizoid features. He assessed a GAF of 25. R. 355. At discharge on April 6, 2007, Plaintiff's final diagnosis was noted as bipolar depression and borderline IQ with a GAF of 50. It was noted that Plaintiff appeared "slow and retarded and was mumbling inaudibly" with limited insight. He was released to his mother for care with medications. R. 351-352.

On May 3, 2007, Plaintiff's mother completed an Adult Function Report for Plaintiff. R. 142. The report suggested that Plaintiff's days consisted of looking for employment, watching TV, and training on occasion as a volunteer fireman. *Id*. She reported that his medicine made him sleepy and that she would set his schedule, provide reminders, and make him his food daily. R. 145.  Plaintiff shopped in stores for food weekly, but could not pay bills, handle savings, or use a checkbook or money orders. *Id.* He went to the movies on occasion

5

with his mother, brother, and friends and had fire drills and appointments weekly. R. 146.

Problems were reported with memory, completing tasks, concentration, understanding, and

following directions. R. 147. It was noted that he became frustrated and depressed with stress.

R. 148. His work history was reported as three days at an aluminum company and three months

at Wendy's. R. 150.

Plaintiff underwent a psychological disability evaluation with Dr. Marvin Wheeler on

June 25, 2007. R. 360-364. Plaintiff took public transportation to the examination and was

cooperative and basically self-sufficient. R. 360. He was to be intaked at Mon Yough Mental

Health on the same day with a psychiatrist but missed the appointment. *Id*. Plaintiff reported

being hypertensive in school due to ADHD. *Id.*  Plaintiff presented as a pleasant withdrawn

male with responses to a mood disorder questionnaire that were consistent with bipolar

disorder. R. 361. Plaintiff reported that he had worked at Wendy's for a few months and was

living alone in an apartment where he did daily chores and had his mother take him shopping.

*Id.*  Dr. Wheeler noted that Plaintiff's affective expression was flat and thought processes were

slow for responding to general questions. His general fund of knowledge was limited and

mental arithmetic presented problems and concentration was slow for subtracting. His memory

was noted as fair, social judgment as questionable, and insight limited. He was diagnosed with

bipolar disorder and borderline intellectual functioning. R. 361. Plaintiff's prognosis was

considered fair with continued compliance with treatment with a GAF of 60. R. 362. Dr.

Wheeler considered him minimally capable of managing personal funds with mental

impairments that have some impact on his ability to complete daily activities on a sustained

basis. *Id.* Plaintiff's concentration was noted as fair, ability to sustain attention to tasks was fair,

ability to sustain concentration for simple, repetitive tasks was considered appropriate, and ability to handle stress and pressures of daily work was considered in the fair range. *Id.*

Dr. Wheeler also completed a residual functional capacity evaluation on the same day. R. 363-364. He opined that Plaintiff had no limitations in remembering, understanding, and carrying out short, simple directions; marked restrictions in remembering, understanding, and carrying out detailed instructions; moderate limitations in making judgments on simple work-related decisions; slight limitations in interacting appropriately with the public; moderate limitations in interacting appropriately with supervisors and co-workers; and marked limitations in responding appropriately to work pressures in the usual work setting and to changes in the usual work setting. *Id.*

On September 24, 2007, Dr. Wheeler performed an intellectual evaluation for disability. Plaintiff reported that he took public transportation to get there and it was noted that he smelled and was dirty. R. 365. Plaintiff appeared tired and responded only to direct questions in a soft and barely audible voice. He could manage his own monies with the help of his mother. Plaintiff reported that he was being seen regularly, at the time, at Mon Yough. He worked at Wendy's but stated that he "couldn't catch on" and was living in a small apartment where his mother helped him maintain his residency. R. 366. He reported that he was sad at times but denied any major depressive issues. Dr. Wheeler administered the Weschler Adult Intelligence Scale Third Edition which yielded IQ scores of 76 in verbal, 70 in performance, and a full scale score of 71. R. 366. Dr. Wheeler indicated that these scores were indicative of intellectual functioning in the low borderline range and that they were valid. Plaintiff's reading scores indicated a level at the beginning of sixth grade and his spelling scores indicated a level

at the beginning of third grade. Dr. Wheeler indicated a fair prognosis suggestive of capability of completing daily activities, but also opined that Plaintiff was not capable of managing his own funds. R. 367.

In a second functional capacity evaluation based on the additional evidence, Dr. Wheeler indicated that Plaintiff had slight limitations in remembering, understanding, and carrying out simple instructions; marked limitations in remembering, understanding, and carrying out detailed instructions; marked limitations in making judgments on simple work related decisions; slight limitations in interacting with the public and co-workers; moderate limitations in interacting with supervisors, and marked limitations in responding appropriately to changes in the usual work setting and responding to work pressures in a usual work setting. R. 368.

On September 27, 2007, Dr. Douglas Schiller performed a review of Plaintiff's records. He noted mild restriction in the activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and one or two periods of decompensation. R. 380. More specifically, Dr. Schiller opined that Plaintiff was markedly limited in the ability to remember, understand and carry out detailed instructions; moderately limited in the ability to maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance and be punctual within customer tolerances; moderately limited in the ability to complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited in the ability to accept instructions and respond appropriately to criticism

from supervisors and in the ability to respond appropriately to changes in the work setting; and moderately limited in the ability to set realistic goals or make plans independently of others. R. 383-384.

Plaintiff reported to the disability hearing officer on April 15, 2008 that he did not understand much of what he read; had a hard time with reading and math; could not focus well; and could not keep a job because he could not understand things. R. 40. At the time he was on Risperadal, Depakote, and Wellbutrin for depression and mood swings. R. 41. He further reported that he was living in an apartment by himself with his mother helping him with cooking, laundry, housework, shopping, and bills. R. 41-42. He described a typical day as getting up around noon, watching TV and playing video games. R. 42. He reported that he could go to certain malls and stores if he knew how to get there on the bus and had no physical limitations. R. 42. He noted that he was easily upset by stressful situations; had difficulty getting along with customers, co-workers, and bosses; became angry easily; had trouble with attention; and had difficulty getting along with others. Plaintiff reported working at Wendy's for two months in the previous year, but had a hard time keeping up with the pace and getting along with others. He further reported that he was not looking for another job because he did not feel that he had the concentration to perform any job. R. 43.

At the hearing before the ALJ, Plaintiff testified that he was no longer living alone and had moved in with his grandmother. His mother and grandmother had been helping him with money. R. 460-466. He testified that he was no longer on medications. R. 468. His mother testified that Plaintiff could not understand simple tasks and that he had been treated in hospitals, schools, and through wrap around programs.  She further testified that he did not

9

want to go to treatment as an adult as a result of not taking his medications. Mother and grandmother took care of Plaintiff's bills and shopping. R. 471-472. Plaintiff attended job corps for a month but was not understanding the job training. Plaintiff's mother noted that it was hard for employers to understand that he needed someone to stand over him and make sure he was doing what he was supposed to do. He also took tests to be admitted into the army on three occasions but could not get high enough scores. R. 473-376.

### B.   Procedural History

Plaintiff received SSI benefits as a child, and was subject to redetermination at the age of eighteen pursuant to regulation. 20 C.F.R. § 416.987. On October 4, 2007, it was found at the initial level that Plaintiff's disability did not continue. R. 26. This determination was upheld on rehearing. R. 33-38. Plaintiff subsequently requested a hearing before an administrative law judge. R. 31-32. An administrative hearing was held on December 10, 2008 before Administrative Law Judge James Bukes ("ALJ").  R. 459-499. Plaintiff was represented by counsel and testified at the hearing. R. 456-79. Plaintiff's mother and an impartial vocational expert also testified. *Id.*

On January 20, 2009, the ALJ rendered a decision which was unfavorable to Plaintiff under the five-step sequential analysis normally applied to determine disability.  R. 15-25. Step one of the sequential analysis is not utilized for redeterminations of disability at age eighteen. 40 C.F.R. § 416.987(b). At step two, the ALJ found that Plaintiff has the following severe impairments: "borderline intellectual functioning and bipolar disorder."  R. 15.  At step three, the ALJ concluded that Plaintiff's impairments did not meet or equal one of the listed impairments set forth in 20 C.F.R. 404 Subpart P, App. 1. *Id*. At step four, the ALJ determined

10

that Plaintiff was unable to return to any past relevant work.  R. 22. At step five, the ALJ

concluded that the government had met its burden to show that Plaintiff had the residual

functional capacity to perform a full range of work at all exertional levels but with the

following nonexertional limitations: "claimant is limited to simple instructions, simple

repetitive tasks, three-step operations, should avoid intensive supervision, should avoid changes

in the work setting, should avoid anything more than simple decision making, should avoid

assembly line pace and should avoid close interaction with co-workers."  R. 17.  The ALJ's

decision became the final decision of the Commissioner on April 17, 2009, when the Appeals

Council denied Plaintiff's request to review the decision of the ALJ.  R. at 5-7.  This litigation

followed.

**III.**     **Legal Analysis**

     A.     <u>Standard of Review</u>

     The Act limits judicial review of disability claims to the Commissioner's final

decision.  42 U.S.C. § 405(g).  If the Commissioner's finding is supported by substantial

evidence, it is conclusive and must be affirmed by the Court.  42 U.S.C. § 405(g); *Schaudeck v.*

*Comm'n of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999).   The Supreme Court has

defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v.*

*Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  It consists of more than a scintilla of evidence, but

less than a preponderance. *Stunkard v. Secretary of Health & Human Servs.*, 841 F.2d 57, 59

(3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Burnett v. Commissioner of Social Security*, 220 F.3d 112,  118-19 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987);  42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways:

> (1)  by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1.  *See Heckler v. Campbell*, 461 U.S. 458 (1983);  *Stunkard*, 841 F.2d at 59;  *Kangas*, 823 F.2d at 777;  or,

> (2)  in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59;  *Kangas*, 823 F.2d at 777.  Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to

12

the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

## B.     Discussion

Plaintiff makes two specific arguments in his motion for summary judgment. First, he claims he met all of the requirements of Listing 12.05 for mental retardation. Plaintiff contends that he suffers from significant intellectual dysfunction and an additional severe mental impairment that manifested itself during the developmental period prior to age 22 and that he had a valid verbal, performance or full scale IQ of 60 through 70. Plaintiff further argues that proving "deficits in adaptive functioning" from the capsule definition of mental retardation is not a requirement of Listing 12.05C, but also argues that he meets this requirement. Finally, Plaintiff argues that the ALJ failed to fulfill his affirmative duty to give a detailed "function-by-function" assessment of the claimant's residual functional capacity. The Commissioner contends that Plaintiff does not meet the criteria of Section 12.05C of the listing, suggesting that Plaintiff was only diagnosed with borderline intellectual functioning, therefore countering Plaintiff's IQ scores. He further argues that Plaintiff was required to meet the requirement of "deficits in adaptive functioning," which he did not.

### 1. Whether Plaintiff meets Listing 12.05C

Plaintiff argues that the ALJ improperly applied the standard when he determined that Plaintiff did not meet Listing 12.05 for mental retardation. Plaintiff contends that if the

ALJ had properly followed the standard set forth in Third Circuit case law, he would have found that Plaintiff met the Listing.

An individual may be considered mentally retarded under Listing 12.05 without a formal diagnosis of mental retardation. *See Velardo v. Astrue,* Civil Action No. 07-1604, 2009 WL 22977 at *13 (W.D.Pa. January 29, 2009). However, a claimant must meet the requirements of Paragraphs A, B, C, or D of Listing 12.05. Section 12.05, Mental Retardation, provides as follows:

> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid, verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
>
> D. A valid, performance, or full scale IQ of 60 through 70 resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or

14

> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, Subpt. P, Appx. 1, listing 12.05.

Plaintiff does not argue that he meets the criteria for Paragraphs A, B, or D despite some suggestion from the record that he either reported or was tested with an IQ of 59 in 2002.[1] Instead, Plaintiff argues that he meets the requirements of 12.05C including an IQ score between 60 and 70, an additional physical and mental impairment imposing additional work-related limitations of function and a showing that the mental retardation manifested itself before age 22. Plaintiff argues that a claimant is not required, under the Listing, to show that he has "deficits of adaptive functioning." Plaintiff, however, contends that, regardless of whether there is an additional requirement that he show deficits in adaptive functioning, the record supports that he had such deficits. In response, the Commissioner argues that to meet the criteria of the 12.05C Listing, Plaintiff must demonstrate "deficits in adaptive functioning" prior to age twenty-two. The Commissioner suggests that IQ scores are "only part" of the overall assessment and that the structure of Listing 12.05 is different than that of other Listings thus requiring this additional criteria. In conclusion, the Commissioner suggests that Plaintiff does not meet Listing 12.05C because he was diagnosed with borderline intellectual functioning and had no significant deficits or impairments in adaptive functioning.

---

[1]

The validity of the score was not confirmed in the record and there was never confirmed any suggestion of testing associated with the score.

As a preliminary matter, Court disagrees with the Commissioner's interpretation of the requirements of Listing 12.05. A majority of cases that have been decided in this district acknowledge that the three prong test delineated in *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003) controls in a situation such as this. In *Markle*, the Court of Appeals for the Third Circuit explained that to meet the requirements of 12.05C a claimant must:

> i) have a valid verbal, performance, or full scale IQ of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22).

324 F.3d at 187. "The Court of Appeals has not held that a claimant is required to prove deficits in adaptive functioning as an additional requirement of Listing 12.05C; rather, it has outlined a three prong test for determining whether a finding of disabled is directed under this section." *Brown v. Commissioner,* Civil Action No. 08-1265, 2009 WL 3087220, *11 (W.D.Pa. September 23, 2009); *See also Jackson v. Astrue,* Civil Action No. 08-1407, 2009 WL 1935873, *4 (W.D.Pa. July 2, 2009; *Maniguault v. Astrue,* Civil Action No. 08-1409, 2009 WL 1181253, *7 (W.D.Pa. April 30, 2009); *Mallough v. Astrue*, Civil Action No. 08-957, 2009 WL 982795, *13 (W.D.Pa. April 9, 2009; *Harrison v. Astrue*, Civil Action No. 07-1136, *4-5 (W.D.Pa. August 29, 2008).[2] Therefore, the issue to be determined is whether substantial evidence exists to support the determination that Plaintiff does not meet the three requirements of Listing 12.05C as delineated in *Markle*.

---

[2]

The Court notes that at least one case has been decided which adopted the fourth requirement that Plaintiff prove "deficits in adaptive functioning" but the Court finds this to be at odds with the well-settled test of the Third Circuit. *See Logan v. Astrue*, Civil Action No. 07-1472, *7-8 (W.D.Pa. September 15, 2008).

16

a.       *Requirement of an IQ score in the 60-70 range.*

To meet the requirements of Listing 12.05C, only one score within the 60-70 range is necessary to satisfy the first prong. *See Burns v. Barnhart*, 312 F.3d 113, 125 ,n. 6 (3d Cir. 2002), noting that the claimant receives the "benefit of the doubt" inasmuch as the lowest score on a multi-part IQ test is the score used in the rest of the analysis. In his opinion, the ALJ stated "Intellectually, the claimant was diagnosed with mild mental retardation in November 1994, with a performance IQ of 66, a verbal IQ of 63 and a full scale IQ of 61. However, most recent intelligence testing completed in September 2007 by Dr. Wheeler, Exhibit 9F, diagnosed borderline intellectual functioning with a verbal IQ score of 76, a performance IQ score of 70, and a full scale IQ score of 71." R. 16 (citations omitted).

In the instant case, there is no question that despite Plaintiff's IQ scores being higher when he was tested a second time, his first set of IQ scores fall within the range established by this prong as well as his performance IQ score from Dr. Wheeler's testing. Dr. Wheeler clearly indicated that he believed the scores to be valid as did the school psychologist performing Plaintiff's initial testing. R. 259-263. The ALJ did not outright reject the IQ scores, including the performance score of 70 from Dr. Wheeler's testing. The opinion suggests that he was attempting to reject the first set of IQ tests in favor of the more recent testing and diagnosis of borderline intellectual functioning. While the ALJ may reject an IQ score, he is required to review all of the pertinent evidence of record and explain his "conciliations and rejections." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 133 (3d Cir. 2000).

The ALJ acknowledged that Plaintiff had been diagnosed with mild mental retardation as a child, but then stated that the later scores were indicative of borderline

17

intellectual functioning. He did not acknowledge that Plaintiff's performance score of 70 fell

within the range. He further failed to rectify his rejection of Dr. Wheeler's opinion that

Plaintiff's reading scores were at the sixth grade level and at the third grade level for spelling

and arithmetic with his acceptance of the findings that Plaintiff had only slight limitations in

the ability to understand, remember, and carry out short simple instructions and interact

appropriately with the public and co-workers. R. 366. The ALJ further failed to acknowledge

other limitations which were indicated in Dr. Wheeler's report including marked limitations in

the ability to remember, understand, and carry out detailed instructions; marked limitations in

making judgments on simple work related decisions; and marked limitations to responding

appropriately to changes in the usual work setting and responding to work pressures in a usual

work setting. R. 368. Since the ALJ failed to properly analyze the first prong under the relevant

law and regulations, this case will be remanded for further consideration.

       *b.*    *Impairments which impose Additional and Significant Work-Related*
               *Limitations of Function*

      The second prong of Listing 12.05C requires evidence of impairments(s) which

impose "additional and significant work-related limitations of function." The ALJ did not

address this requirement in his evaluation of 12.05C. This prong is satisfied if the ALJ

identifies one or more severe impairments at step two of his analysis. In August 2000, the SSA

clarified that it always had intended the phrase "to mean that the other impairment is a 'severe'

impairment as defined in §§ 404.1520(c) and 416.920(c)." *See Markle*, 324 F.3d at 188,

*quoting* "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain

Injury," 65 Fed.Reg. 50746, 50772 (August 21, 2000). Here, at step two, the ALJ identified

bipolar disorder as a second severe impairment which imposed several non-physical limitations

on his residual functional capacity. Accordingly, Plaintiff's bipolar disorder satisfies the second prong of 12.05C and this prong should therefore not be revisited on remand.

          *c.*     *Onset of Mental Retardation Manifested Itself during the Development Period.*

      The final requirement of § 12.05C is that the claimant's mental retardation manifested itself during the development period, *i.e.*, before the age of 22. *Markle*, 324 F.3d at 187. The Court of Appeals has held that the claimant has the burden of establishing that mental retardation commenced during the development period. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992). Here, the evidence of record indicates that all of Plaintiff's impairments manifested themselves before the age of 22 as he was only 20 at the time of the hearing. All of Plaintiff's medical records, including his IQ testing, were all from a period before he turned 22. Therefore, there is no question that his limitations manifested themselves during the development period and this prong need not be revisited on remand.

          *2.*     *Residual Functional Capacity Assessment*

      Plaintiff additionally argues that the ALJ erred in his determination of Plaintiff's residual functional capacity. Specifically, Plaintiff contends that the ALJ accounted for some of the mental limitations imposed by the two consultative examiners but rejected others without proper explanation. Plaintiff argues that the ALJ failed to incorporate his "documented marked limitations of dealing with routine work pressures or for making simple work-related decisions" resulting in an inadequate hypothetical question to the vocational expert. (Plaintiff's Brief at 28-29)**.** The Commissioner responded by arguing that the ALJ properly incorporated all of Plaintiff's functional limitations into his residual functional capacity assessment.

"'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett,* 220 F.3d at 121(quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations. *See Cooper v. Barnhart*, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a). In determining a person's RFC, an administrative law judge must consider all the evidence of record. 20 C.F.R. §§ 404.1520, 416.920. Although an administrative law judge can weigh the credibility of the evidence when making an RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. *Id.* As the court stated in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Id.* at 121 (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

In making his residual functional capacity determination, the ALJ considered the Plaintiff's testimony and that of his mother. In rejecting much of this testimony, the ALJ relied most heavily on the reports of Dr. Wheeler which included his diagnosis of borderline intellectual functioning and residual functional capacity findings as part of his final RFC assessment. As discussed above, the ALJ failed to properly consider Plaintiff's IQ scores in conjunction with Dr. Wheeler's other observations and reconcile the significance of Plaintiff's performance IQ score and previous IQ scores with his intellectual deficits. Therefore, the Court finds that the ALJ's residual functional capacity determination is not supported by substantial evidence and the ALJ shall reconsider this assessment on remand.

**IV.**      **Conclusion**

Under the Social Security regulations, a federal district court upon review of the decision of the Commissioner which denied benefits has three options.  It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration.  42 U.S.C. § 405(g) (sentence four).  In light of an objective review of all of the record evidence, the Court finds that the ALJ failed to support his opinion with substantial evidence and that the decision must be remanded to the ALJ for further consideration consistent with this opinion.  Therefore, Plaintiff's motion for summary judgment will be granted insofar as it requests a remand for further consideration and Defendant's motion for summary judgment will be denied.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NATHAN SCHMIDT, | ) |
| | ) |
| Plaintiff, | )        2:09-cv-707 |
| v. | ) |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER OF COURT**

**AND NOW**, this 23rd day of December, 2009, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1.      Defendant's Motion for Summary Judgment (Document No. 10) is **Denied.**

2.       Plaintiff's Motion for Summary Judgment (Document No. 8) is **Granted**
insofar as it requests a remand consistent with the foregoing memorandum
opinion and **REMAND** is **Ordered.**

3.      The Clerk will docket this case as closed.

BY THE COURT:

s/Terrence F. McVerry
United States District  Court Judge

cc:      Karl E. Osterhout, Esquire
Email:karl@keolaw.com

Lee Karl, Esquire
Email: lee.karl@usdoj.gov